FILED

**James Everett Shelton**
**316 Covered Bridge Road**
**King of Prussia, PA 19406**
**(484) 626-3942**
**jeshelton595@gmail.com**

2018 AUG 15 PM 4: 56

DISTRICT COURT
DLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

**Plaintiff, Pro Se**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | | |
|---|---|---|
| **JAMES EVERETT SHELTON**<br>**316 Covered Bridge Road**<br>**King of Prussia, PA 19406** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action** |
| **vs.** | ) ) | **No. _____** |
| **CSG SOLUTIONS CONSULTING LLC**<br>**5703 Red Bug Lake Road, Suite 226**<br>**Winter Springs, FL 32708** | ) ) ) ) | 6'-18-CV-1335-Orl -4 (KRS |
| **CSG SOLUTIONS SERVICES LLC**<br>**5703 Red Bug Lake Road, Suite 226**<br>**Winter Springs, FL 32708** | ) ) ) ) | |
| **VINCENT CAMPASANO, Sr., individually and**<br>**as owner, officer, manager, agent, partner or**<br>*de facto* **principal of CSG Solutions; CSG**<br>**Solutions Services LLC, TheCSGSolutions.com,**<br>**SecondChoiceHorizon.com, currently believed to**<br>**be inactive or the fictitious business entities of**<br>**Campasano**<br>**173 S. Kirkman Road Apt 2077,**<br>**Orlando, FL 32811** | ) ) ) ) ) ) ) ) ) ) | |
| **CARLOS SINENCIO GUERRERO a/k/a**<br>**CARLOS GUERRRO, individually and as owner,**<br>**officer, manager, agent, partner or**<br>*de facto* **principal of CSG Solutions; CSG**<br>**Solutions Consulting LLC;**<br>**TheCSGSolutions.com;**<br>**SecondChoiceHorizon.com**<br>**6132 Quail Ridge Dr,**<br>**Lakeland, FL 33813** | ) ) ) ) ) ) ) ) ) | **Complaint** |

1

CARLOS D. GUERRERO, a/k/a CARLOS          )
GUERRERO, as owner, officer, manager, agent,  )
partner or *de facto* principal of CSG Solutions  )
Consulting LLC; TheCSGSolutions.com;      )
SecondChoiceHorizon.com                   )
6132 Quail Ridge Dr,                      )
Lakeland, FL 33813                        )
        Defendants          )      **Jury Trial Demanded**

## COMPLAINT:

Plaintiff JAMES EVERETT SHELTON brings this action for damages, statutory

damages, court costs, and injunctive relief under rights pursuant to Federal Statute under 47

U.S.C. 227, and 47 C.F.R. 64 for the *ultra vires* illegal actions and deliberate and knowing

tortious activity of the CSG SOLUTIONS CONSULTING LLC and CSG SOLUTIONS

SERVICES LLC (collectively "CSG"), and VINCENT CAMPASANO, Sr. ("Campasano"),

CARLOS SINCENCIO GUERRERO a/k/a CARLOS GUERRERO ("Guerrero, Sr.") and

CARLOS D. GUERRERO a/k/a CARLOS GUERRERO ("Guerrero Jr."), collectively

"Defendants", in negligently and/or willfully contacting Plaintiff via Plaintiff's telephone to

solicit sales ("Sales Calls") using an automatic telephone dialing system ("ATDS calls") in

violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* and related claims

that form part of the same claim or controversy. Plaintiff demands a trial by jury, and complains

and alleges as follows:

## I.      Introduction

1.    Plaintiff James Everett Shelton ("Plaintiff") brings this action under the Telephone

Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to

widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices.

*See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

2

2.      Plaintiff brings this action to challenge CSG's practices in the telephone solicitation of its products and services. Specifically, Plaintiff challenges CSG's and CSG's agents' illegal telephone solicitations by which it markets its products and services by calling consumers whose numbers are listed on the National Do-Not-Call Registry utilizing automated dialing equipment, and CSG's failure to maintain a Do-Not-Call list or Do-Not-Call policy.

3.      The TCPA is designed to protect consumer privacy by prohibiting unsolicited telemarketing calls to cellular telephones, unless the caller has the "prior express written consent" of the called party.

4.      "Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by" the Federal Communication Commission.[1]

5.      Plaintiff alleges that Defendants made or commissioned numerous telemarketing calls Plaintiff's cellular telephone number for the purposes of advertising CSG's services, using an automatic telephone dialing system (ATDS), which is prohibited by the TCPA.

6.      Plaintiff never consented to receive any of these calls.

7.      All of the claims asserted herein arise out of CSG's illegal telephone solicitation campaign and are a common fact pattern.

## II.      Jurisdiction and Venue

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9.      Venue is proper in this court in that Defendants conduct business in, and a substantial

---

[1] *Omnibus TCPA Order*, GC Docket 02-278, FCC 15-72, 2015 WL 4387780, ¶ (July 10, 2015)

part of the events giving rise to plaintiff's claims occurred in, Florida's Seminole County. Both CSG defendants conduct business in this judicial district and are registered Florida limited liability companies. The Individual Defendants all are residents of the State of Florida.

### III. Parties

10. Plaintiff JAMES EVERETT SHELTON ("Plaintiff") is an individual who received the alleged phone calls on his private mobile telephone line mentioned herein. Plaintiff is an adult individual and citizen of the Commonwealth of Pennsylvania who has a residence of 316 Covered Bridge Road, King of Prussia, PA 19406.

11. Defendant CSG SOLUTIONS CONSULTING LLC ("CSG") is a Florida limited liability company with a registered principal address of 5703 Red Bug Lake Road, Suite 226, Winter Springs, FL 32708, which transacts business in, *inter alia*, Montgomery County, Pennsylvania. This entity is currently inactive with the Florida Secretary of State and was administratively dissolved by the State of Florida on September 22, 2017 for failing to file an annual report. Defendant's principal address and mailing address listed on the Secretary of State is a post office box. Defendant's Registered Agent is Carlos Guerrero. Defendant's authorized person is Carlos Guerrero, who is listed as the Manager, with an address of 1310 S. Florida Ave, Wauchula, FL 33873. A Google Search of this address shows that "Wauc 1310 Radio Station" is the business at this address. CSG may be served by and through its Registered Agent, Carlos Guerrero, at his usual place of abode, 6132 Quail Ridge Dr, Lakeland FL 33813.  CSG is not registered to do business in the Commonwealth of Pennsylvania, however, CSG markets and sells, *inter alia*, lower credit card interest rate and/or credit card debt consolidation services to people in Pennsylvania.

4

12.     Defendant CSG SOLUTIONS SERVICES LLC ("CSG") is a Florida limited liability company with a registered principal address of 5703 Red Bug Lake Road, Suite 226, Winter Springs, FL 32708, which transacts business in, *inter alia*, Montgomery County, Pennsylvania. This entity is currently inactive with the Florida Secretary of State and was administratively dissolved by the State of Florida on September 23, 2016 for failing to file an annual report. Defendant's principal address and mailing address listed on the Secretary of State is a post office box. Defendant's Registered Agent is Vincent Campasano. Defendant's authorized person is Vincent Campasano, who is listed as the Manager, with an address of 115 Rose Ave, Clermont, Fl 34715. CSG may be served by and through its Registered Agent, Vincent Campasano, at his usual place of abode, 173 S. Kirkman Road Apt 2077, Orlando, FL 32811. CSG is not registered to do business in the Commonwealth of Pennsylvania, however, CSG markets and sells, *inter alia*, lower credit card interest rate and/or credit card debt consolidation services to people in Pennsylvania.

13.     Upon information and belief, Defendant VINCENT CAMPASANO, Sr., (hereinafter; "Campasano" or "defendant"), at or about the time the within violations occurred, was owner, officer, manager, agent, partner or *de facto* principal of CSG Solutions; CSG Solutions Services LLC.; TheCSGSolutions.com and Second Choice Horizon, which, according to the Florida Secretary of State are either non-existent or currently inactive entities or both. Upon information and belief, Campasano may be served at his usual place of abode, 173 S. Kirkman Road Apt 2077, Orlando, FL 32811. Campasano reaps the benefit of the tortious and illegal conduct described herein that is technically carried out only in CSG's name. Such tortious, or *ultra vires*, conduct exceeds the permissible actions of corporations both in Florida, Pennsylvania, and nationwide.

14.    Upon information and belief, Defendant CARLOS SINCENCIO GUERRERO a/k/a

CARLOS GUERRERO, (hereinafter; "Guerrero" or "Guerrero, Sr."), at or about the time the

within violations occurred, was owner, officer, manager, agent, partner or *de facto* principal of

CSG Solutions; CSG Solutions Consulting LLC.; TheCSGSolutions.com and Second Choice

Horizon, which, according to the Florida Secretary of State are either non-existent or currently

inactive entities or both. Upon information and belief, Guerrero may be served at his usual place

of abode, 6132 Quail Ridge Dr, Lakeland FL 33813. Guerrero reaps the benefit of the tortious

and illegal conduct described herein that is technically carried out only in CSG's name. Such

tortious, or *ultra vires*, conduct exceeds the permissible actions of corporations both in Florida,

Pennsylvania, and nationwide.

15.    Upon information and belief, Defendant CARLOS D. GUERRERO a/k/a CARLOS

GUERRERO, (hereinafter; "Guerrero" or "Guerrero, Jr."), at or about the time the within

violations occurred, was owner, officer, manager, agent, partner or *de facto* principal of CSG

Solutions; CSG Solutions Consulting LLC.; TheCSGSolutions.com and Second Choice Horizon,

which, according to the Florida Secretary of State are either non-existent or currently inactive

entities or both. Guerrero, Jr. is the son of Guerrero, Sr. Upon information and belief, Guerrero

may be served at his usual place of abode, 6132 Quail Ridge Dr, Lakeland FL 33813. Guerrero

reaps the benefit of the tortious and illegal conduct described herein that is technically carried

out only in CSG's name. Such tortious, or *ultra vires*, conduct exceeds the permissible actions of

corporations both in Florida, Pennsylvania, and nationwide.

16.    Defendant[s] theCSGSolutions.com and Second Choice Horizon are various business

names associated with Campasano and Guerrero, whereupon, at the time of the subject calls,

maintained a principal place of business in a Private Mail Box, paid for by Campasano and Guerrero, Sr., located at 265 S. Federal Hwy, Suite (BOX)226, Deerfield Beach FL 33441.

17.     At all times herein mentioned, the CSG Defendants, and each of them, were an agent or joint venture of each of the other, and in doing the acts alleged herein, were acting within the scope of such agency. Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

18.     At all times herein mentioned, the Individual Defendants, and each of them, were an agent or joint venture of each of the other, and in doing the acts alleged herein, were acting within the scope of such agency. Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

19.     Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance to the other Defendants in committing the wrongful acts alleged herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoing complained of each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

20.     At all times herein mentioned, Defendants conspired by means of mutual understanding, either expressly or impliedly, among themselves and others in engaging and/or planning to engage in the activities detailed herein to accomplish the wrongful conduct, wrongful goals, and wrongdoing.

**Background**

**The Telephone Consumer Protection Act**

12.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the

telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing ...

can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L.

No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The National Do-Not-Call Registry

13.     The National Do Not Call Registry allows consumers to register their telephone numbers

and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47

C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the

registration is cancelled by the consumer or the telephone number is removed by the database

administrator." Id.

14.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations

to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R.

§ 64.1200(c)(2).

The TCPA Prohibits Automated Telemarketing Calls

15.     The TCPA makes it unlawful to make any call (other than a call made for emergency

purposes or made with the prior express written consent of the called party) using an automatic

telephone dialing system or an artificial or prerecorded voice ... to any telephone number

assigned to a ... cellular telephone service." See 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA

provides for a private cause of action to persons who receive calls in violation of 47 U.S.C. §

227(b)(1)(A). See 47 U.S.C. § 227(b)(3).

16.     According to findings by the Federal Communications Commission ("FCC"), the agency

Congress vested with authority to issue regulations implementing the TCPA, such calls are

prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

17.     The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003). In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines.

Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

> In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

**The TCPA imposes personal liability on individuals who participate in or commission telemarketing calls.**

18.     Under the TCPA, an individual such as CAMPASANO and/or GUERRERO may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 227 of the TCPA, which reads, *inter alia*:

[T]he act, omission, or failure of any agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be deemed to be the act, omission, or failure of such carrier or user *as well as of that person.*

47 U.S.C. § 227 (emphasis added).

19.     When considering individual officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. See, *e.g., Jackson v. Five Star Catering, Inc., v. Beason,* 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections,* 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

20.     Defendants CAMPASANO and GUERRERO are personally liable under the "participation theory" of liability because they were the Principal owners of CSG, knew of CSG's violations, and directed employees and/or agents of CSG to continue making those violations.

21.     This is because Defendants CAMPASANO and GUERRERO authorized and oversaw each of CSG's telemarketing processes and calls which were made on behalf of CSG.

22.     Furthermore, Defendants CAMPASANO and GUERRERO are also personally liable because they was responsible for ensuring CSG's agents and/or employees' TCPA compliance.

## Background

### A. The Worsening Problem of Robocalls and Illegal Telemarketing

23.     Unfortunately, the problems Congress identified when it enacted the TCPA have grown only worse in recent years.

24.     "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

25.     "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the TCPA of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

26.     In 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. For every month in the fiscal year, robocalls made up the majority of consumer complaints about Do Not Call violations. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc.

27.     Recently, *The New York Times* reported extensively on the surging number of robocall complaints filed by consumers with the FTC and widespread consumer outrage about illegal telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging,*

11

N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

## B. The Worsening Problem of Credit Card Lower Interest Rate Robocalls

**28.**     For many years now, American consumers have been getting robocalls from "Rachel from Card Services". According to the Federal Trade Commission ("FTC"), "Rachel and her cohorts – Anne, Tiffany, Michael, Heather, and others – from "Card Services" have been annoying people for years with their illegal robocalls.[2]

**29.**     According to the FTC, these "Card Services" robocallers claim they can lower your credit card interest rates, however, in reality, this is a scam. In an August 21, 2015 article published by the FTC's Do Not Call Program Coordinator, Bikram Bandy, in response to the question: "Can "Card Services" actually lower my interest rate?", the FTC answered:

"Nope. It's a scam. If you press "1," you're connected to a scammer who will ask for your credit card number and other personal information.

They'll make promises to lower your interest rate permanently — sometimes to a ridiculously low 0% — but charge a fee that can be as high as $5,000. But their promises aren't true. There are no guarantees for permanently lowered interest rates. And it's against the law to charge a fee up-front for these services. Most people who pay the fee don't get a lower rate — in fact, they get into worse debt, and may find unauthorized charges on their cards."

## C. Defendants' Role in this Explosion of Illegal Robocalling

**30.**     Upon information and belief, Campasano and Guerrero partnered with each other, forming two separate but identical business entities in which those entities, operating out of the same private mailbox (PMB, and jointly marketed their services as a business that could purportedly help lower credit card interest rates.

**31.**     Defendants all used a private mailbox, 5703 Red Bug Lake Rd, Suite 226, Winter

---

[2] https://www.consumer.ftc.gov/blog/2015/08/whats-deal-rachel-card-services-your-top-3-questions-answered

Springs, FL 32708, as a registered mailing address, which was paid for by Guerrero and Campasano.

**32.**     The two defendants used an automatic telephone dialing system (ATDS) and used such device[s] to initiate calls to consumers throughout the country including Plaintiff.

**33.**     In using such dialers, an ATDS has the capacity to load, store and initiate calls to numbers in its system or can be programmed to initiate calls from an algorithm, either randomly or sequentially, with or without human intervention.

**34.**     In producing these calls, the subject dialer's not only produced the defendants prerecorded message about their services, the dialers initiated those calls to consumers whose numbers were on the National Do-Not-Call Registry.

**35.**     Plaintiff sues Campasano and Guerrero individually under the Responsible Corporate Officer Doctrine.

**36.**     Campasano makes the day to day decisions for his companies.

**37.**     Guerrero makes the day to day decisions for his companies.

**38.**     Campasano was registered with the State of Florida as a telemarketer.

**39.**     The defendants' *modus operandi* was to incorporate and use an ATDS to solicit consumers including Plaintiff.

**40.**     It is believed the foregoing calls were initiated by entities, retained, employed or contracted by the Defendants for the events cited within this complaint, acting under Agency at the defendants' direction or control.

**41.**     Likewise, it is alleged the Defendant's calling agents were prohibited from revealing their actual name and location until and unless the called party showed interest by providing their credit card number.

**42.** The defendants each bear a measure of culpability and blameworthiness for their unlawful acts because they failed, refused or consciously turned a blind eye to exercise the duty, control and responsibility along with the power and authority, to curtail the fraudulent and unlawful activities of their employees.

**43.** Plaintiff repeatedly told the defendants to stop calling but claims were made by various callers that they have no control over the calling list.

**44.** Through the use or employment of an ATDS, both defendants cold-called unsuspecting recipients, whereby and subsequently initiating unwanted and prohibited telemarketing calls about the defendants' services to a select list of recipients into Pennsylvania including Plaintiff.

**Factual Allegations**

**45.** Plaintiff received all of the calls as alleged herein on his personal cellular telephone number, (484) 626-3942. Plaintiff's number has been successfully registered on the National Do-Not-Call registry since June 26, 2015, and has also been successfully registered on the Pennsylvania Do-Not-Call list since May 15, 2018.

**46.** (484) 626-3942 is the only telephone number which Plaintiff owns.

**47.** These calls would be made from a number which displayed on Plaintiff's caller identification as (484) 626-2324. This number was obviously generated using local area-code caller ID spoofing, which was done using a computer in an attempt to confuse Plaintiff into thinking someone locally was calling.

**48.** On many occasions, which Plaintiff has struggled to document, defendants would call on an unknown number. This was done purposefully to cloak defendant's true identity or make it nearly impossible for Plaintiff to trace back to defendants, so they could be held responsible.

**49.** The defendants' calls start with a prerecorded announcement stating:

14

"Hello this is Jonathan with Debt Partners. I see looking at your debt profile you may qualify for a lower monthly payment and a lower interest rate on your unsecured debt. You also can qualify for paying a portion of what you owe. Please press 1 now to check your eligibility or press 9 to put your number on the DNC list."

**50.**     When Plaintiff pressed one, the calls were transferred from the robodialer to a live agent.

**51.**     If at any time Plaintiff asked that agent any question that was considered too inquisitive, the agent would immediately terminate the call.

**52.**     The purpose of the defendant's calls as stated in their message was to acquire Plaintiff's credit card number, eventually confirming the card holder had a minimum amount thereon.

**53.**     In such calls where a live agent eventually came on line, that agent told plaintiff he must have a minimum balance of $4,000 on that card to qualify for the special rate program.

**54.**     The concept was that the caller[s] would claim that the interest on such card can be reduced to zero, provided the card-holder was willing to pay a $2,000.00 service fee for doing so.

**55.**     After the cardholder provides their credit card information to the caller[s], the caller[s] tell you how much money you will save by signing up to do business with the caller's company, thus attempting to justify their outrageous fees.

**56.**     If asked for a company name, the caller[s] used a generic name such as Credit Card Services, a non-existent business entity.

**57.**     The caller[s] would always refuse to provide a legitimate business name unless and until Plaintiff provided his credit card number.

**58.**     If Plaintiff refused to provide the card number, the caller[s] immediately terminated the call.

**59.**     The defendants used these tactics to perpetrate a fraud or injustice, or otherwise to circumvent the law.

**60.**     On multiple occasions, Plaintiff provided his real credit card number, last four digits of his social security number, and date of birth. Defendants told Plaintiff they were "checking his eligibility". Defendants would go on hold for several minutes. During this time, Defendants were simply calling the automated system maintained by Plaintiff's credit card company and using the information provided to get Plaintiff's current credit card balance, as well as the date and amount of Plaintiff's last payment.

**61.**     If Plaintiff's credit card did not have a high enough balance (i.e. over $4,000), Defendants asked if Plaintiff had any other credit cards and insisted that Plaintiff needed to have a balance greater than this amount in order to qualify. In response to this, Plaintiff simply told the defendants he was not interested and hung up. Plaintiff did not want to risk that any more of his financial information would be compromised, as what he had already done to attempt to identify the defendants behind this robocall campaign, in revealing some of his sensitive personal information to a random cold-caller, was quite risky.

**62.**     The above-described events took place so often that it was very difficult, if not impossible, for Plaintiff to try to uncover who was responsible. Over the course of many months, during the fall of 2017 and spring of 2018, Plaintiff received dozens of these calls but could never figure out who was behind them. Plaintiff began to simply hang up on these "credit card lower interest rate" robocalls from "Rachel from Cardholder Services", instead of wasting time trying to uncover their identities.

**63.**     It was not until June, 2018 that Plaintiff finally identified the defendants as being responsible for these telemarketing calls. The following is a spreadsheet listing dates and times that Plaintiff received telemarketing calls from the defendants:

16

| Calls to Plaintiff's Cell Phone (484) 626-3942 | | | |
|---|---|---|---|
| **Date:** | **Time:** | **Caller ID:** | **Notes** |
| 10/17/2017 | 1:54 PM | 484-626-2324 | Credit Card Lower interest rate robocall |
| 1/26/2018 | 5:54 PM | Unknown | Credit Card Lower interest rate robocall |
| 1/26/2018 | 7:10 PM | Unknown | Credit Card Lower interest rate robocall |
| 2/2/2018 | 1:42 PM | 484-626-2324 | Credit Card Lower interest rate robocall |
| 4/18/2018 | 6:41 PM | 484-626-2324 | Credit Card Lower interest rate robocall |
| 5/16/2018 | 1:40 PM | 484-626-2324 | Credit Card Lower interest rate robocall |
| 6/08/2018 | 12:57 PM | 484-626-9245 | Credit Card Lower interest rate robocall. They refused to give me a valid company name. |
| 6/08/2018 | 1:34 PM | (888) 245-9181 | Caller gave website secondchoicehorizon.com, which I googled at the time to check out while on phone. Caller hung up on me before I could ask not to be placed on the DNC list. |
| 6/08/2018 | 1:36 PM | (888) 245-9181 | Caller gave website secondchoicehorizon.com. |
| 6/11/2018 | 12:12 PM (PST) | (888) 245-9181 | Received e-mail from billing@thecsgsolutions.com at 5:16 AM on June 10, 2018. Caller referenced this e-mail. |
| 6/11/2018 | 12:14 PM (PST) | (888) 245-9181 | Hang up call, ATDS |
| 6/11/2018 | 12:15 PM (PST) | (888) 245-9181 | Hang up call, ATDS |
| 6/11/2018 | 12:18 PM (PST) | (888) 245-9181 | Hang up call, ATDS |
| 6/11/2018 | 12:20 PM (PST) | (888) 245-9181 | Hang up call, ATDS |
| 6/21/2018 | 12:58 PM (PST) | 484-626-2324 | I was on the Los Angeles Metro when this call came in. Spoke to Indian rep. I was not interested and hung up. |

| 6/21/2018 | 1:30 PM (PST) | (877) 847-2911 | It was the same Indian rep that I spoke with that called me at 12:58 PM (PST) earlier on June 21. I hung up the phone because I was not interested. |
|-----------|---------------|----------------|----------------|
| 6/21/2018 | 1:54 PM (PST) | Unknown | The same Indian rep called me. I hung up because I was not interested and was busy. |
| 6/21/2018 | 1:55 PM (PST) | Unknown | Same Indian rep |
| 6/21/2018 | 2:06 PM (PST) | (877) 847-2911 | Hang up call, ATDS |
| 6/21/2018 | 2:07 PM (PST) | (877) 847-2911 | Hang up call, ATDS |
| 6/21/2018 | 2:07 PM (PST) | (877) 847-2911 | Hang up call, ATDS |
| 6/21/2018 | 2:07 PM (PST) | (877) 847-2911 | Hang up call, ATDS |
| 6/21/2018 | 2:07 PM (PST) | (877) 847-2911 | Hang up call, ATDS |
| 6/21/2018 | 2:28 PM (PST) | (877) 847-2911 | Hang up call, ATDS |

**64.**     On or about June 8, 2018, Plaintiff received a prerecorded robocall from a number which displayed on Plaintiff's caller identification as (484) 626-9245. After hearing a prerecorded message about saving money on credit card interest rates, Plaintiff was connected with a representative from "Second Choice Horizon".

**65.**     During that call, Plaintiff took steps to ascertain the identity of the caller and feigned interest for this exact reason, namely by requesting that the caller send Plaintiff an e-mail with their company information. However, Plaintiff never consented to receiving any additional telemarketing calls.

**66.**     Plaintiff was given the website www.secondchoicehorizon.com to visit in connection with this phone call.

**67.**     Plaintiff visited www.secondchoicehorizon.com on June 8, 2018, at or around the time of

the telemarketing call.

**68.**     Plaintiff received two more calls from Defendants on June 8, 2018. This time, they used

the caller ID (888) 245-9181.

**69.**     The number 888-245-9181 is a direct connection to Second Choice Horizon because it is

listed all over the internet as the contact number for Second Choice Horizon, including on

Facebook, Twitter, the Better Business Bureau, and on Second Choice Horizon's website.[3]

**70.**     As    a    result    of    this    phone    call,    Plaintiff    received    an    e-mail    from

billing@thecsgsolutions.com on June 10, 2018 at 5:16 AM.

**71.**     Second Choice Horizon is not a real business entity. It is merely a fictitious business name

for the defendants to use, in order to operate anonymously and to hide from apt consumers such

as the Plaintiff who will not hesitate to file a claim against them.

**72.**     The Defendants use www.thecsgsolutions.com as the joint operating website for the

corporate CSG Solutions entities, as well as the Individual Defendants.

**73.**     www.thecsgsolutions.com is identical to www.secondchoicehorizon.com, in terms of

layout, color scheme, content, promotional and advertising messages, and font. Both websites

purport to offer credit card lower interest rate and/or credit card debt consolidation services to

consumers.[4]

**74.**     This is because the Individual Defendants set up this website to work in concert with

www.secondchoicehorizon.com.

**75.**     www.thecsgsolutions.com and www.secondchoicehorizon.com both operate using the

---

[3] See, for example, https://archive.is/ICF0L

[4] See https://archive.is/Glqq0 and https://archive.is/hKK2l

19

same web hosting provider, Bluehost.

76.     The defendants, calling from the number 888-245-9181, continued to annoy and harass Plaintiff on June 11, 2018. Plaintiff received five (5) calls within the span of approximately eight (8) minutes.

77.     Plaintiff was physically in the State of California on June 11, 2018.

78.     These calls began with a distinctive click and pause, followed by a period of dead air and a "bloop" sound and a machine noise, followed by choppy audio, which is indicative of a predictive dialer transferring Plaintiff to a live human being. These facts demonstrate that the call was made using an automatic telephone dialing system ("ATDS" or "autodialer") as that term is defined in 47 U.S.C. § 227(a)(1).

79.     When a human being arrived on the phone line, the Plaintiff received a scripted sales pitch about getting lower interest rates on his credit cards.

80.     The representative had a distinct Indian accent.

81.     Plaintiff told the caller he was not interested and hung up the phone.

82.     Despite this clear expression that Plaintiff did not want to get any more calls, Plaintiff received another four (4) calls from 888-245-9181 on June 11, 2018, attempting to get Plaintiff to do business with the Defendants.

83.     Plaintiff attempted to answer these calls, however, they would all disconnect a few seconds after Plaintiff answered and said "hello". Plaintiff suspects that this call was placed using an Automatic Telephone Dialing System (ATDS) because there was nobody on the line to be connected to and because there was machine noise in the background. Because of their automated nature, such systems often exhibit this abnormal behavior.

**84.**     Additionally, Plaintiff suspects that these calls were placed using an Automatic

Telephone Dialing System (ATDS) because of the tremendously short time for a call back, and

the fact that he said "Hello" a few times and heard clicking, choppy audio, and machine noise

before the calls were disconnected.

**85.**     On June 21, 2018, defendants continued to harass Plaintiff with robocalls. This time

around, defendants continued to use the spoofed caller ID which displayed on Plaintiff's cell

phone as 484-626-2324.

**86.**     Similarly to the events as described above, Plaintiff answered and heard a distinctive

click and pause, followed by a few seconds of dead air, followed by a balloon-popping "bloop"

sound.

**87.**     When a human being arrived on the phone line, Plaintiff was connected to the same

Indian representative as before, who was calling on behalf of the defendants. Plaintiff heard a

scripted sales pitch about getting lower interest rates on his credit cards.

**88.**     Plaintiff was still in the State of California on June 21, 2018.

**89.**     After listening to the sales pitch for an extended period of time, the telemarketer said he

would get a "financial advisor" on the phone. Instead, the call abruptly disconnected.

**90.**     At 1:30 PM, defendants called Plaintiff back using an ATDS (similar circumstances as

before) from 877-847-2911. Plaintiff spoke to the defendants for a few minutes, then the call

disconnected.

**91.**     At 1:54 PM and 1:55 PM, Plaintiff received robocalls from "unknown" caller IDs using

system. When Plaintiff answered, he experienced the same ATDS-call circumstances as before- a

long pause, followed by a "bloop" sound. Plaintiff quickly realized it was the same Indian

representative calling on behalf of defendants with a lower credit card interest rate sales pitch.

**92.** Plaintiff was busy and simply hung up the phone.

**93.** When the defendants called back using the same ATDS system as before at 1:55 PM, the Indian seemed agitated that Plaintiff had hung up the phone. Plaintiff hung up once again.

**94.** Upon information and belief, Defendants have the ability and capacity to use their telephone dialing system to display unknown or no caller ID whatsoever. This is characteristic of an ATDS. Most legitimate callers do not usually call on unknown caller ID.

**95.** Between 2:06 PM and 2:07 PM, defendants contacted Plaintiff's cell phone with robocalls, placing five (5) within two minutes, and another at 2:28 PM.

**96.** Plaintiff attempted to answer these calls, however, they would all disconnect a few seconds after Plaintiff answered and said "hello". Plaintiff suspects that this call was placed using an Automatic Telephone Dialing System (ATDS) because there was nobody on the line to be connected to and because there was machine noise in the background, as well as the incredibly short amount of time to receive call(s) back. Because of their automated nature, such systems often exhibit this abnormal behavior.

**97.** People are complaining to the Better Business Bureau about CSG. On July 9, 2018, a consumer wrote the following.[5]

07/09/2018
Advertising / Sales Issues
     **Complaint**
     "I did not understand the services that they were going to provide me.
     I asked them to cancel after I received credit cards in the mail. When I was contacted by the number they stated they would help lower my credit card debit [sic]. I did not understand they would sign me up for new cards. I have never open the cards or used them and had to have them closed by capital one and chase. CSG continues to call me saying I owe them money I did want more credit cards. On 6/1/18 they told me they were sending me to collections, I have not received any service and do not want them to open cards for me.
     **Desired Settlement**

---

[5]    https://www.bbb.org/central-florida/business-reviews/debt-relief-services/csg-solutions-services-in-orlando-fl-90334562/reviews-and-complaints?section=reviews&reviewtype=negative

I want to company to stop calling me as I do not want there [sic] service. They are saying I owe them 3600.00 and they have not helped lower my credit card debit. they are rude and making me very scared."

**98.**     People are complaining online about unsolicited telemarketing calls from 877-847-2911,

which is the number that defendants used to call Plaintiff on June 21, 2018. See

https://800notes.com/Phone.aspx/1-877-847-2911. On February 12, 2018, a consumer wrote:

They keep calling with fake phone numbers and asking for my credit card information to lower the interest rates. They are calling from India and they call 3-5 times a day.
*Caller: 8778472911*
*Call type: Scam suspicion*

**99.**     On May 10, someone with the screenname "Batman" complained online about the

number 877-847-2911, saying:

This number is a known number of scammers attempting to steal credit card information from those in debit [sic] or the elderly.

*Caller: Credit Card Debit [sic] Consolidation*

*Call type: Scam suspicion*
See https://whocallsme.com/Phone-Number.aspx/8778472911.
**100.**    At no time did Plaintiff provide his consent to receive any calls from Defendants and/or

their agents.

**101.**    Prior to these unsolicited calls, the Plaintiff has never done any business with Defendants

and Plaintiff never provided Defendants with his cellular telephone number.

**102.**    Defendants did not have the Plaintiff's prior express written consent to make these calls.

In fact, before filing this lawsuit, the Plaintiff wrote to CSG asking if they had his prior express

written consent to make the calls, but CSG did not provide any evidence of consent.

**103.**    Defendants failed and/or refused to provide a written copy of their internal company Do-

Not-Call policy to Plaintiff, despite a written e-mail request and notice of Plaintiff's intent to file

a formal claim.

**104.** Pursuant to 47 CFR 64.1200(d)(1), a telemarketer is required, upon request, to send a consumer a written copy of their company Do-Not-Call Policy.

**105.** Defendants failed and/or refused to put Plaintiff's number on their internal company Do-Not-Call list.

**106.** To the extent Defendants contend that they obtained consent or agreement from Plaintiff for the calls at issue here, the Telemarketing Sales Rule, 16 C.F.R. § 310.5(a)(5), requires that such records be maintained. In any event, consent is an affirmative defense under the TCPA, this defense is unavailable unless Defendants can show that they had prior express consent in writing, and that they have otherwise complied with all of the requirements of 47 C.F.R. § 64.1200(c)(2), including maintaining written procedures on national do-not-call rules, training personnel on national do-not-call rules, maintaining an internal do-not-call list, and accessing the national do-not-call database no more than 31 days prior to making any calls, and maintaining records documenting such access. Defendants did not have prior express written consent to such calls from Plaintiff, and did not produce any such written consent, even though the Plaintiff contacted CSG inquiring about the calls before filing this lawsuit.

**107.** Plaintiff received the calls on his private mobile telephone, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii). Plaintiff's telephone number is registered with T-Mobile as a cellular telephone number and is used as a residential and personal telephone.

**108.** Plaintiff pays for each incoming and outgoing call on his telephone under an unlimited calling arrangement, as defined and set forth in 47 CFR § 64.1200(a)(1)(iii).

**109.** These telephone solicitations constituted "calls" under the TCPA that were not for emergency purposes.

**110.** Plaintiff was harmed by these calls. Plaintiff was temporarily deprived of legitimate use

of his phone because the phone line was tied up during the telemarketing calls and his privacy was improperly invaded. Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff. The calls caused Plaintiff's cell phone battery's depletion, used up cellular data, and prevented Plaintiff from otherwise using his telephone for lawful purposes.

## Causes Of Action

### First Cause of Action

(Negligent Violation of the TCPA "RoboCall" Prohibition, 47 U.S.C. § 227 et seq.)

**111.**    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**112.**    As a result of Defendants' and Defendants' agents' negligent violations of 47 U.S.C. § 227(b)(1)(A), Plaintiff seeks for himself $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

**113.**    Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

### Second Cause of Action

(Knowing and/or Willful Violation of the TCPA
"RoboCall" Prohibition, 47 U.S.C. § 227 et seq.)

**114.**    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**115.**    As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 U.S.C. § 227(b)(1)(A), Plaintiff seeks for himself treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(b)(3).

**116.** Pursuant to 47 U.S.C. § 227(b)(3)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

**Third Cause of Action**

(Negligent Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. § 227 et seq.)

**117.** Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**118.** As a result of Defendants' and Defendants' agents negligent violations of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself $500 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(c)(3)(F).

**119.** Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

**Fourth Cause of Action**

(Knowing and/or Willful Violation of the TCPA
"Sales Call/DNC" Prohibition, 47 U.S.C. § 227 et seq.)

**120.** Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**121.** As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. 64.1200(c)(2), Plaintiff seeks for himself treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(c)(5).

**122.** Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff seeks injunctive relief prohibiting such conduct in the future.

**Fifth Cause of Action**

(Negligent Violation of the TCPA "Do-Not-Call Policy" Requirement, 47 CFR 64.1200 et seq.)

**123.** Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**124.** As a result of Defendants' and Defendants' agents' negligent violations of 47 CFR 64.1200(d)(1), Plaintiff seeks for himself $500 in statutory damages for each and every violation, pursuant to the implied private right of action.

### Sixth Cause of Action

(Knowing and/or Willful Violation of the TCPA
"Do-Not-Call Policy" Requirement, 47 CFR 64.1200 et seq.)

**125.** Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**126.** As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 CFR 64.1200(d)(1) Plaintiff seeks for himself treble damages, as implied, up to $1,500.00 for each and every violation, pursuant to the implied private right of action.

### Seventh Cause of Action

(Negligent Violation of the TCPA "Do-Not-Call List" Requirement, 47 CFR 64.1200 et seq.)

**127.** Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**128.** As a result of Defendants' and Defendants' agents' negligent violations of 47 CFR 64.1200(d)(3), Plaintiff seeks for himself $500 in statutory damages for each and every violation, pursuant to the implied private right of action.

### Eighth Cause of Action

(Knowing and/or Willful Violation of the TCPA
"Do-Not-Call List" Requirement, 47 CFR 64.1200 et seq.)

**129.**     Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

**130.**     As a result of Defendants' and Defendants' agents knowing and/or willful violations of 47 CFR 64.1200(d)(3) Plaintiff seeks for himself treble damages, as implied, up to $1,500.00 for each and every violation, pursuant to the implied private right of action.

<u>**WHEREFORE, Plaintiff prays for relief against defendants, as follows:**</u>
## IV.     <u>Prayer for Relief</u>

On Causes of Action 1-8:

1. For awards of $500 for each negligent violation as set forth in actions 1-8.

2. For awards of $1,500 for each knowing and/or willful violation as set forth in actions 1-8.

3. Injunctive relief against Defendants, and each of them, to prevent future wrongdoing; Total statutory damages: <u>**$39,000**</u> (Twenty-four counts of "Sales call to a number registered on the National Do-Not-Call Registry" & "ATDS call", one counts of "Failure to Put Plaintiff's Number on Defendants' Do-Not-Call list", and one count of "Failure to provide a copy of Defendant's Do-Not-Call Policy", with treble damages for each.)

4. Prejudgment interest at the maximum legal rate;

5. Costs of suit herein incurred; and

6. All such other and further relief as the Court deems proper.

## V.    Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: August 12, 2018

James E. Shelton

James Everett Shelton
*Plaintiff, Pro Se*
316 Covered Bridge Road
King of Prussia, PA 19406
Phone: 484-626-3942
Jeshelton595@gmail.com